UNITED STATES of America and Peter P. Calarco, Special Agent, Internal Revenue Service, Petitioners,

v.

Daniel MILLMAN, Respondent.

No. 84–474 Misc. (JBW).

United States District Court,
E.D. New York.

Dec. 10, 1986.

U.S. Dept. of Justice, Washington, D.C. by Gerald Miller, Trial Atty., Tax Div., for petitioners.

Kostelanetz & Ritholz by Lawrence S. Feld, New York City (Rosenblatt & Mass by Leonard Rosenblatt, of counsel), for respondent.

## JUDGMENT

WEINSTEIN, Chief Judge:

Following a full hearing before United States Magistrate A. Simon Chrein, on the record before the Magistrate and oral argument, the "Report and Recommendation of the Magistrate" set out below is adopted by the court.

The petitioner's request to enforce the summons is granted.

The respondent's request for further discovery is denied.

So ordered.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE

A. SIMON CHREIN, United States Magistrate.

This is an action to enforce petitioner's tax subpoena pursuant to 26 U.S.C. § 7602(b) and § 7604(a) (1982).

## FACTS

In or about 1968, David Millman, a tax attorney, invested along with his clients in certain oil and gas leases identified as Bowers # 1 well located in Clearfield County, Pennsylvania and Well # 37 located in Keating Township Pennsylvania. *See* JA 24.[1] Mr. Millman retained Boyd Brown, a certified petroleum geologist and engineer to survey these properties and determine their fair market value in order to enable Mr. Millman and his clients to take their pro rata share of charitable deductions on their individual income tax returns. JA 24–25. Thereafter some of Mr. Millman's clients took a charitable deduction in conformity with Mr. Brown's estimates which was followed by an Internal Revenue Service (Service) audit of their returns. *See id.* at 25–26. Mr. Millman's clients appealed the Service's decision. At the appeals hearing in 1977, these clients were represented by Mr. Millman. Representing the Service was Meyer Baer, from the Internal Revenue Service's Appeals Office and Frank Caponegro, an Internal Revenue Service Engineering Agent. Mr. Caponegro's method of appraisal with respect to the wells involved herein differed significantly from Mr. Brown's appraisals. *Id.* at 26. At the hearing there was some acrimony between Mr. Millman and Mr. Caponegro. *See* Transcript of Oct. 25, 1985 at 12. [Oct. 25 Tr].[2]

Subsequently, these cases ("Millman/Brown" cases) were settled at 41% of Mr. Brown's appraised value. JA 41. Mr. Caponegro testified that he was unaware that his appraisals were revised upward in appellate settlement proceedings until one month before the present proceedings.[3] At some point during these earlier proceedings, communications between Mr.

---

1. References to "JA" are to the Joint Appendix filed with the Court of Appeals of the Second Circuit in *United States v. Millman,* 765 F.2d 27 (2d Cir.1985).

2. The hearing held by the undersigned was conducted over the course of five days: Oct 4, 25, 28, 29 and November 29, 1985. References preceded by a date and the letters "Tr." are to the transcripts of the particular day cited.

3. There are no indications in the Service's file which would lead one to believe that the settlements were advantageous or disadvantageous to the Government. Transcript of Oct. 4, 1985 at 177–78. [Oct. 4 Tr].

Millman and Mr. Caponegro broke down. Oct. 25 Tr 214.

During the course of the Millman/Brown cases and in response to Service directives encouraging agents to report cases suspected of fraud, Mr. Caponegro prepared memoranda setting forth his suspicions of overvaluation with respect to the wells involved herein. Oct. 25 Tr 45. Over a period of years, Mr. Caponegro prepared three memoranda setting forth his suspicions of overvaluation which were then given to his manager. *See* Oct. 25 Tr. 66 and 170. The first two memoranda were written while the Millman/Brown cases were still pending. *Id.* at 45.

In 1981, the Service initiated an audit of Mr. Millman's 1979 individual tax return. The selection of his return for audit was accomplished by computer selection. Transcript of Oct. 4, 1985 Tr. 61–62 (Oct. 4 Tr.). Sometime thereafter, Mr. Caponegro's group manager assigned him the Millman return for review. Oct. 25 Tr. 15–16. While reviewing both the Millman/Brown cases and Mr. Millman's individual return, Mr. Caponegro formed the opinion that Mr. Millman was a person who "peddles tax evasion." Oct. 25 Tr. 20. Mr. Caponegro believed Mr. Millman had the background and experience to enable him to ascertain an accurate value for the leases, and that he failed to do so. In addition, Mr. Caponegro believed that Mr. Millman espoused a pattern or practice of overvaluation as opposed to his being involved in an isolated incident of overvaluation. *See* Oct. 25 Tr 172. Finally, Mr. Caponegro faulted Mr. Millman because Mr. Millman failed to discount the "stream of revenue" with respect to these wells. Oct. 25 Tr. 330–332.

In keeping with these beliefs, Mr. Caponegro issued a third memorandum alerting his superiors to his suspicions of fraud with respect to Mr. Millman's return. *See* Oct. 25 Tr. 45.

In conjunction with this audit, Mr. Caponegro requested that Revenue Agent Stanley Tepper[4] obtain certain information from Mr. Millman; this procedure was necessary due to the earlier breakdown in communications between Mr. Millman and Mr. Caponegro. *Id.* at 214. Mr. Millman complied with Mr. Tepper's request and submitted certain documents relating to the ownership and operation of Bowers # 1 well. JA 224. Ms. Susan Patch, also an engineering agent with the Service, testified that there is nothing unusual about engineering agents assisting revenue agents on a case. *See* Oct. 4 Tr. 235–36. This is especially true for the Brooklyn Internal Revenue District which does not have an engineering group attached to it and as such when an engineering issue is involved they must call on the Manhattan Internal Revenue District which does have an engineering group. *Id.* at 236.

Thereafter, Mr. Tepper again requested documents, this time relating to the production and income of Bowers # 1 well. Mr. Millman refused to comply with the request claiming that the Service already had these documents in their possession from the audit of his client's tax returns. JA 224. Although Mr. Caponegro kept a file which contained relevant documents concerning wells under IRS investigation, this file was merely an industry file as opposed to an official file dealing exclusively with the wells herein. Oct. 25 Tr. 147–148.

In August of 1982, Revenue Agent Tepper issued a fraud referral report[5] with respect to Mr. Millman. Attached to this report was at least one of the previously discussed memoranda prepared by Mr. Caponegro. Transcript of Oct. 28, 1985 Tr. 437–38 (Oct. 28 Tr.) Although Mr. Caponegro had conversations with Agent Tepper concerning the fraud referral report, Mr. Caponegro did not know that the fraud

---

4. Respondents chose not to obtain Mr. Tepper's testimony for use at the hearing before the undersigned.

5. The undersigned has reviewed the fraud referral report *in camera* and has made a determina-

tion that in the event that had discovery been appropriate, certain portions of the report may have been discoverable. But in view of the determination made herein, the issue is presently moot.

referral report was filed until Special Agent Calarco informed him of this fact some time later, Oct. 25 Tr. 232, in fact, Mr. Caponegro testified that he has never seen the report. *Id.* 232–33.

In September of 1982, Special Agent Peter Calarco was assigned to investigate Mr. Millman's tax liabilities, if any. Oct. 28 Tr. 399.

The procedures employed when the fraud referral was transferred from the examination division to the criminal investigation division (CID) were testified to by Special Agent Calarco. George Tierney, a group manager at the CID, gave Special Agent Calarco the fraud referral report and asked him to evaluate it. *See* Oct. 28 Tr. 406–408, 411. Subsequently, Special Agent Calarco indicated that the referral had potential for investigation. Special Agent Calarco testified that his evaluation was based primarily upon the facts contained in the referral and gave little weight to the conclusions of Mr. Caponegro contained in the attached memoranda. Transcript of Oct. 29, 1985 656, 657 (Oct. 24 Tr.). On September 16, 1982, the case was accepted by the CID, *id.* at 423 and endorsed by Joel Weiner, Revenue Agent Tepper's group manager; Thomas LoCicero, a branch chief at that time; and Wayne Thomas, Chief of the Examination Division. Oct. 4 Tr 164. Mr. Caponegro testified that he never made a recommendation to the CID concerning the Millman return. Oct. 25 Tr. 21.

Sometime thereafter, Special Agent Calarco served a summons upon Michael Berg, a Certified Public Accountant involved in disbursing the distribution proceeds from the wells to Mr. Millman's clients. *See* Oct. 29, Tr. 670, JA at 60. The Berg summons sought substantially the same records that were subsequently requested by the Millman summons. Oct. 29 Tr. 670. Mr. Berg informed Special Agent Calarco that he did not possess the

records sought by the summons but rather Mr. Millman did. *See* Oct. 29 Tr. 671, 588. This information was one factor which prompted Special Agent Calarco to serve a summons on Mr. Millman. *id.* at 671. Although the record is not clear as to the chronology of the Berg and Brown summonses, it is clear that before Special Agent Calarco issued the Millman summons he served a summons upon Boyd Brown with which Mr. Brown complied. *See Id.* at 673.

During the week of July 25, 1983, Revenue Agent Farley was assigned to replace Revenue Agent Tepper and examine the Millman return. *See* Oct 4 Tr. 57, 69. Agent Farley testified that his only contact with Agent Tepper was a single brief conversation in which Agent Tepper informed him that the Millman case involved a valuation issue which was referred to the CID. Oct. 4 Tr. 70, 97, 101–103. Agent Farley's only contact with Mr. Caponegro was on September 18, 1985, after the date that the Millman summons had been issued. *Id.* at 99.

Agent Farley testified that two factors, among others, were predominant in Revenue Agent Tepper's decision to issue the fraud referral. One was Mr. Caponegro's evaluation with respect to the wells at issue and two, Mr. Millman's intent in valuing his interest in the wells when taking his charitable deduction. *Id.* at 105.

On July 25, 1983, Special Agent Calarco issued and served the summons herein to Mr. Millman with the approval of his superiors. Oct. 28 Tr. 571. Before issuing the Millman summons, Special Agent Calarco discussed the issuance of the summons with his group manager, George Tierney; District Counsel; and Revenue Agent Tepper. *Id.* at 569, 570. The summons seeks financial, ownership, production, operation and distribution information concerning the two wells at issue.[6] Special Agent Calarco

---

6. The text of the summons at issue is set forth below. The Service seeks

[A]ny and all records relating to the ownership, operation and distribution of earnings of the BOWERS # 1 Well located in the County

of Clearfield State of Pennsylvania and the Well # 37 located in Keating Township, Pennsylvania on lot 551, Warrant # 2187, both wells believed to be gas and/or oil producing, including, but not limited to the names, ad-

testified that he had spoken with Mr. Caponegro approximately three to four times before Mr. Calarco issued the summons *Id.* at 401. However, Mr. Calarco also testified that Mr. Caponegro had "virtually nothing to do with the case other than the report [memoranda] that he supplied to Mr. Tepper" *Id.* at 401–402.[7]

Special Agent Calarco testified that Mr. Caponegro did not request that he issue the summons or obtain the documents sought for Mr. Caponegro's use, but rather Special Agent Calarco testified that the documents sought were for his own use in determining Mr. Millman's correct income tax liabilities and whether he committed an act in violation of the Internal Revenue laws. *Id.* at 402–403. The contact between Special Agent Calarco and Mr. Caponegro consisted of two meetings at which time they discussed the types of records utilized by the oil industry. *See* Oct. 28 Tr. 556–558. Special Agent Calarco did not solicit Mr. Caponegro's advice as to whether he should issue the summons. *See id.* at 561.

At the time Special Agent Calarco issued the summons, the Service had in its possession files obtained from Boyd Brown, Agent Tepper and Mr. Caponegro's file. Oct. Tr. 584–585. Although the service possessed some but not all of the records sought by the Millman summons, none of these records were obtained from Mr. Millman himself. *Id.* at 638–642. In light of the fact that none of the records received were obtained from Mr. Millman, Special Agent Calarco pursued Mr. Millman's files for various reasons. First, Special Agent Calarco believed that records obtained from sources other than the taxpayer are not sufficiently probative as to precisely what the taxpayer [Mr. Millman] relied upon in claiming a deduction. *See id.* at 643, 682.

Second, due to statements made by Mr. Berg, Special Agent Calarco had reason to believe that certain records with respect to these wells might have been prepared by someone other than Mr. Brown.

Third, in the Service's eyes, Mr. Millman's repetitive and prolonged involvement characterized Mr. Millman as a central figure in these investments necessitating the need for Mr. Millman's records. *Id.* at 689.

Fourth, since one of the purposes of the investigation of Mr. Millman is to determine if the charitable deduction is a permissible or fraudulent deduction, Mr. Millman's intent is a key factor which can only be gleaned from documents he relied on. *See id.* at 682.

Finally, since another aim of the summons is to determine the amount of compensation received by Mr. Millman from his clients, the Service needs Mr. Millman's papers. Oct. 28 Tr. 500–506.

Special Agent Calarco testified that at the time he served the summons he did not

---

dresses, social security numbers and any other identifying information of any operating (General Partners); and/or non-operating partner (Limited Partners); the name, address and social security number of any other identifying information of the lessor of the property and rights; copies of all lease agreements and any and all records of payments made on the lease; the name and identifying information of the actual operator (drilling entity) of the wells; any and all records of rents and royalties received in connection with the wells (production records); the name and identifying information of the purchasers of the gas and or oil; any and all records reflecting the purchase, sale or other transfer of the various partnership shares, including contracts, lease agreements, engineers reports (Appraisals), cancelled checks, and any other documents related to any transactions or

transfer, and payment of rents, royalties or any other expense for the above mentioned wells.
All the above for the period beginning with the upstart of the investment in the wells concluding with the end of the calendar year 1982.
Also it shall be stated above where the term "Partner" is utilized, also shall be included and/or "The Owner."
JA 16

7. Respondents in a footnote on page 6 in their Memorandum of Law in Support of Post-Hearing Discovery mischaracterize the court's comments. The hypothetical warning given by the Court was certainly not to be construed as a finding by the undersigned that any of Mr. Calarco's testimony may have been misleading.

have any of Mr. Millman's records and still does not. *Id.* at 403–404; Oct. 29 Tr. 683.

Subsequent to the issuance of the summons, in November of 1984, the Service obtained the file of a taxpayer named Acker, (Acker file) an investor in the wells at issue. The Acker file provided the Service with some relevant information concerning the wells herein.

Sometime in 1985, the Service obtained the file of another taxpayer named Hock, also an investor in the wells herein. Mr. Hock's file also provided the Service with some additional information. *Id.* at 584.

Although in March of 1985, the Service modified the summons so as to delete documents that the Service subsequently discovered in its possession, these deletions concerned documents received from sources other than Mr. Millman. *See* JA 247–251.

Mr. Millman was both an investor in and tax attorney for these oil and gas investments. Mr. Millman has not complied with the summons claiming that it was issued for an improper purpose in that the summons was issued in an effort to punish Mr. Millman for his previous representation of clients with respect to these oil and gas investments. In support of this contention, Mr. Millman suggests that Mr. Caponegro's alleged hostility toward him infected the institutional posture of the Service. He claimed that Mr. Caponegro's hostility toward him is based in part on a professional jealously of Mr. Brown and this jealousy has manifested itself in valuations which Mr. Millman alleges were grossly disproportionate to the values assigned by Mr. Brown.[8] On this basis, Mr. Millman moved to dismiss the petition, or in the alternative, moved for an evidentiary hearing. JA 20–21. The Honorable Jack B. Weinstein denied Mr. Millman's request for an evidentiary hearing. JA 277. Mr. Millman thereafter successfully appealed this decision to

the Second Circuit which reversed and remanded the case to conduct a hearing as to whether the IRS summons was issued for an improper purpose. *United States of America, et al. v. Daniel Millman, Esq.,* 765 F.2d 27 (2d Cir.1985). Pursuant to referral from the Honorable Jack Weinstein, the undersigned held a hearing with respect to the propriety of the summons.

It has been represented to the undersigned that there has been no referral of the Millman return to the Department of Justice for prosecution.

## DISCUSSION

Pursuant to 26 U.S.C. § 7602(a) (1982), the IRS has the authority to issue summons "to examine any books, papers, records or other data which may be relevant or material to ... the correctness of any return ... [in] determining the liability of any person for any internal revenue tax." Limitation of this authority is provided for under subsection (c) which states in pertinent part, "[n]o summons may be issued ... if a Justice Department referral is in effect with respect to such person." 26 U.S.C. § 7602(c) (1982). The seminal cases dealing with this subsection are *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964) and *United States v. LaSalle,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978).

The Internal Revenue Service must make a preliminary showing that

(1) the investigation will be conducted pursuant to a legitimate purpose

(2) the inquiry may be relevant to the purpose

(3) the information sought is not already within the Commissioner's possession.

(4) the administrative steps required by the Code have been followed.

---

8. Proceedings with regard to the enforcement of tax subpoena are intended to be expeditious in nature. Although Mr. Millman was given considerable latitude at the hearing to explore the issue of valuation the undersigned has throughout these proceedings made clear to counsel that the valuation issue is of limited significance in these summary proceedings. An inquiry into the valuation issue may be more appropriate to a court assessing the question of tax deficiency.

*Powell,* 379 U.S. at 57–58, 85 S.Ct. at 254–55. Mr. Millman has in essence challenged the Service's prima facie case based on elements one through three.

Once the Service has made this requisite showing, the burden then shifts to the taxpayer to disprove one of the above elements or to demonstrate that judicial enforcement should be denied on the ground that it would be an abuse of the court's process. *LaSalle,* 437 U.S. at 316, 98 S.Ct. at 2367.

The Second Circuit has not clearly stated what quantum of proof is required to meet this burden. In *United States v. Crans,* 517 F.Supp. 863, 865 (N.D.N.Y.1981), the court referred to the *Powell* requirements as being "minimal requirements". *See United States v. Davey,* 543 F.2d 996, 1000 (2d Cir.1976).

Other circuits have characterized the *Powell* requirements as a "prima facie case" or "a minimal showing." Circuits have held the Service to have met this burden merely by presenting an affidavit from the agent issuing the summons to the effect that the four elements have been complied with. *Matter of Newton,* 718 F.2d 1015, 1019 (11th Cir.1983), *cert. denied sub nom Trio Mfg. v. United States,* 466 U.S. 904, 104 S.Ct. 1678, 80 L.Ed.2d 153 (1984) (citing *United States v. Southeast First National Bank of Miami Springs,* 655 F.2d 661, 664 (5th Cir.1981) (footnote omitted)); *United States v. Davis,* 636 F.2d 1028, 1034 (5th Cir.1981), *reh'g denied,* 654 F.2d 71 (5th Cir.1981), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981); *United States v. Moon,* 616 F.2d 1043, 1946 (8th Cir.1980); *United States v. Garden State National Bank,* 607 F.2d 61, 68 (3rd Cir.1979); *United States v. Kis,* 658 F.2d 526, 536 (7th Cir.1981) *cert. denied sub nom Salkin v. United States,* 455 U.S. 1018, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982) (the burden on the Service to prove the *Powell* elements is a "slight one"). To require a higher burden of proof would unduly curtail the Service's enforcement powers. *See Kis,* 658 F.2d at 536.

On the other hand, the taxpayer's burden of proof has been characterized as a "heavy burden". The taxpayer must disprove the existence of any "valid civil tax determination or collection purpose by the Service" *United States v. Chase Manhattan Bank,* 598 F.2d 321, 326 (2d Cir.1979) (quoting *LaSalle,* 437 U.S. at 316, 98 S.Ct. at 2367). Whether the acts which allegedly constitute harassment rise to the level of bad faith is left to the district court. *United States v. McCarthy,* 514 F.2d 368, 375 (3d Cir.1975).

Although it is proper for the Court to consider an agent's motive or alleged animosity in determining whether a summons was issued for the purpose of harassment, it is not dispositive of the propriety or impropriety of a summons. *See LaSalle* at 316 n. 17, 98 S.Ct. at 2367 n. 17; *United States v. Chase Manhattan Bank,* 598 F.2d at 326. But rather it is the Service's institutional posture which must be the focus of any tax subpoena enforcement proceeding. *See LaSalle,* 437 U.S. at 316, 98 S.Ct. at 2367.

*Legitimate Purpose*

■ It is undisputed that there has been no referral to the Department of Justice for prosecution. Despite this fact, the court's inquiry into good faith must not end; the Court must further probe into the Service's institutional posture with respect to the summons.

Although the Service is prohibited from issuing a summons for the purpose of gathering evidence for criminal prosecution, *see LaSalle,* 437 U.S. at 316–317, 98 S.Ct. at 2367, the legitimacy of purpose is not lost solely because an agent has referred the case to the CID. In fact, such a referral may be necessary to avoid the expiration of a statute of limitation. *United States v. Texas Heart Institute,* 755 F.2d 469, 479 (5th Cir.1985).

The nature of summons enforcement proceedings is often hybrid in that there is an interlocking criminal and civil purpose. These seemingly diverse aspects are often intertwined, and as such, the mere possibility of criminal liability would not preclude

the enforcement of the summons at issue. *See LaSalle,* 437 U.S. at 309–312, 98 S.Ct. at 2363–65.

Mr. Millman contends that the Service issued the Millman summons in an effort to harass him. In support of this contention, Mr. Millman contends that the Service's institutional posture was infected by Mr. Caponegro's alleged hostility toward him.[9]

In formulating his beliefs as to Mr. Millman, Mr. Caponegro considered the taxpayer's intent in determining whether Mr. Millman's valuations were fraudulent. Mr. Caponegro believed that Mr. Millman had the experience and knowledge to determine accurate values of the leases, but failed to do so. In addition, the fact that Mr. Millman was involved in many cases involving a similar charitable deduction as the one herein lead Mr. Caponegro to believe that Mr. Millman was involved in a pattern or practice of abusive overvaluation thereby further evincing Mr. Millman's culpable intent. To suggest that any of these factors is an improper consideration is without merit. Mr. Caponegro did not seek to punish Mr. Millman for his successful representation of his clients but by the same token, he was not compelled to ignore Mr. Millman's prior involvements with respect to the leases in formulating a belief as to whether he believed Mr. Millman's return to be fraudulent.

If this court were to find that Mr. Caponegro, acting within Service guidelines, should not have pursued these sincerely held beliefs, it would cripple the investigatory function of the Internal Revenue Service.

The Court is cognizant of the inherent adversarial nature of tax proceedings, but this, in and of itself, is not sufficient to prove hostility. The undersigned finds that Mr. Caponegro acted pursuant to his sincerely held belief that Mr. Millman's activities were fraudulent and not out of an animosity for him. There is no evidence that Mr. Caponegro suffered professionally

as a result of the Millman/Brown settlements. In fact, there is no information contained in the Service's files to indicate whether the settlements were advantageous or disadvantageous to the Government. Oct. 4 Tr. 177–178. Moreover, a settlement at 41% of Mr. Brown's appraised value can not be said to be grossly disadvantageous to the Government.

It is clear that Mr. Caponegro was possessed of a significant ego as was evident from his testimony concerning his role in uncovering the Home Stake Oil cases, a nationwide oil and gas fraud. *See* Oct. 25 Tr. 102, 106, 107. While it is arguable that Mr. Caponegro may have nurtured hopes of duplicating his earlier coup by way of a prosecution of Mr. Millman, the undersigned has considered and rejected this rationale because any "victory" over Mr. Millman would surely be anticlimatic in Mr. Caponegro's mind in view of his characterization of Mr. Millman's case as a small case. *Compare id.* at 88 and 90 *with id.* at 85.

Although it is clear that Mr. Caponegro's memorandum played a role in Revenue Agent Tepper's decision to issue the fraud referral reports, the mere physical attachment of Mr. Caponegro's memorandum to the report is insufficient evidence from which to infer an institutional infection. *See* Oct. 28 Tr. 437–438.

I am unpersuaded that the seemingly insubstantial contacts that transpired between Mr. Caponegro and Revenue Agent Tepper could have resulted in an infection of the Service's posture; in light of Ms. Patch's testimony that it is customary for Revenue Agents and Service Engineers to work together on a matter pending before the Service.

Mr. Millman also seeks to show the Service's intention to harass Mr. Millman by pointing to certain unannounced visits by the Service to Mr. Tardi and Mr. Brenner, investors in the wells discussed herein.

---

**9.** On page 5 of Respondent's Reply Memorandum In Support of Post-Hearing Discovery, it is contended that bad faith on the part of Mr. Caponegro was conceded. The undersigned's recollection is that dislike of Mr. Millman not bad faith was conceded.

*See* Oct. 29 Tr. 677–678. Special Agent Calarco testified that such unannounced visits are a customary practice of the Service. The utility of these unannounced visits is that such visits encourage candor in that they foreclose the possibility that the interviewee will seek professional advice before the interview. *Id.* at 679.

It is clear from the testimony offered that the Service considered the issue of Mr. Millman's intent to be significant. *See* Oct. 4 Tr. 105; Oct 29 Tr. 689, 691–692. Pursuant to 26 U.S.C. § 6653 (1982) [10] any assessment of civil penalties rests on a determination of the taxpayer's intent. An investigation as to the potential civil liability of a taxpayer is properly within the purview of § 7602. *See LaSalle,* 437 U.S. at 314, 98 S.Ct. at 2366; *United States v. Chase Manhattan Bank,* 598 F.2d 321, 325–326 (2d Cir.1979), *enforced,* 486 F.Supp. 317 (S.D.N.Y.1979); *United States v. Moll,* 602 F.2d 134, 138 (7th Cir.1979); *United States v. Kemper Money Market Fund, Inc.,* 575 F.Supp. 1505, 1507 (N.D.Ill.1983) (citing *United States v. Kis,* 658 F.2d 526, 538 (7th Cir.1981)).

I remain unpersuaded by the fact that civil fraud penalties were not sought against other taxpayers involved in the same oil and gas investments.

In order to support a claim of selective prosecution, Mr. Millman must make a prima facie showing

(1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and

(2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*United States v. Ross,* 719 F.2d 615, 619 (2d Cir.1983) (citing *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974)).

Mr. Millman has failed to sustain his burden as to the first element of the *Berrios* test. As the Government correctly points out, Mr. Millman, unlike the other investors, has been involved in several lease investments of a questionable nature, has experience and knowledge concerning such investments, and finally there is evidence that Mr. Millman coordinated various aspects of this investment thereby causing other investors to rely upon his advice with respect to the leases. Such factors sufficiently distinguish Mr. Millman from the other investors in the leases. *See United States v. Kelley,* 769 F.2d 215, 218 (4th Cir.1985). Since it is difficult to prove intent as a necessary element of an offense, it is conceivable that the Government would seek to pursue Mr. Millman rather than those who relied on his advice, especially since Mr. Millman's pattern of involvement in these leases, coupled with his experience and knowledge with respect to such leases, could serve as a basis from which a trier of fact could infer the requisite intent. *See* Oct. 29 Tr. 687–692. Therefore, Mr. Millman can not properly rely on a theory of selective prosecution to infer improper purpose.

In conclusion, the undersigned finds no invidious reason for Mr. Caponegro's distaste of Mr. Millman, but rather that this distaste was a product of Mr. Caponegro's sincerely held belief that Mr. Millman was

---

**10.** Title 26 U.S.C. § 6653 entitled "Failure to pay tax" provides in pertinent part:

> (a) Negligence or intentional disregard of rules and regulations with respect to income, gift, or windfall profit taxes.—
> (1) In general.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B, or by chapter 45 (relating to windfall profit tax) *is due to negligence or intentional disregard* of rules or regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment....
> (b) Fraud.—
> (1) In general.—If any part of any underpayment (as defined in subsection (c)) of the tax required to be shown on a return *is due to fraud* there shall be added to the tax an amount equal to 50 percent of the underpayment.
> (Emphasis added).

a dishonest taxpayer. Pursuit of Mr. Millman on this basis does not offend any notions of fair play.

The undersigned remains unpersuaded that Mr. Caponegro had any significant role in the development of the investigation once the case was accepted by CID or that he played any role in the decision to issue the summons.

Therefore, the undersigned finds on the basis of evidence it finds to be credible, that the institutional posture of IRS was not infected by any alleged hostility on the part of Mr. Caponegro, and as such, the government has met its burden under the first prong of the *Powell* test.

*Documents Within the Service's Possession*

■ While it is true that the Service did possess documents or information relating to the production of the wells herein from Appalachian Petroleum, Oct. 29 Tr. 641; identities of purchasers, *id.* at 643; engineering reports, *id.* at 643; and contracts and lease agreements, *id.;* it contends that none of these documents were obtained from Mr. Millman. *Id.* at 645, 683. In fact, Special Agent Calarco testified that the Service does not know who submitted certain of these documents. It is clear that this anonymity could have an effect on probativeness.

Mr. Millman contests the Service's request to produce the documents sought. He maintains that this request is directed at the narrow issue of valuation of the two wells. Furthermore, Mr. Millman contends that documents concerning the Bowers #1 well were sought and produced with respect to his 1979 return. JA. 224. In contrast, the action herein focuses on Mr. Millman's potential tax liability with respect to the years 1979, 1980 and 1981.

The mere fact that the Service requests re-examination of records will not support a taxpayer's claim of harassment. In *Norda Essential Oil and Chemical Co. v. United States,* 230 F.2d 764 (2d Cir.1956), *cert. denied,* 351 U.S. 964, 76 S.Ct. 1028, 100 L.Ed. 1484 (1956), the court allowed reexamination of a taxpayer's records

which previously had been used to determine his tax liability for the years 1949–1951. Since the reexamination of the records was not for the purpose of reassessing the taxpayer's 1949–51 tax liability but rather used to determine a tax liability for subsequent years, the court allowed reexamination.

As was noted in *Norda,* the Code only prohibits the *"unnecessary* examination or investigations, and only one inspection of a *taxpayer's* books of account shall be made *for each taxable year....."* 26 U.S.C. § 7605(b) (1982) (emphasis added). Since Mr. Millman's 1980 and 1981 personal income tax has not been the subject of a prior IRS audit, a reexamination of his records is not indicative of an improper intention harass.

Furthermore, the test is not whether such information is available from another source but whether the "examination is *unnecessarily duplicative* of some prior examination." (emphasis added). *United States v. Davey,* 543 F.2d at 1000.

The interplay between concepts of relevancy and possession are crucial in the instant case. Although a document may be undisputably within the Service's possession, the relevance of that document may hinge on the source of the document. In other words, documents obtained from one source may be more probative than the same documents obtained elsewhere.

Relevancy in the context of § 7602 is whether the documents sought "might throw light on the correctness of the taxpayer's return." *United States v. Arthur Young & Co.,* 677 F.2d 211, 218 (2d Cir. 1982), *aff'd in part, rev'd in part,* 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1906, 80 L.Ed.2d 456 (1984); *United States v. Davey,* 543 F.2d 996, 1000 (2d Cir.1976) (citing *United States v. Shlom,* 420 F.2d 263, 265 (2d Cir.1969), *cert. denied,* 397 U.S. 1074, 90 S.Ct. 1521, 25 L.Ed.2d 809 (1970); *United States v. Harrington,* 388 F.2d 520, 523–24 (2d Cir.1968). I am satisfied that the documents sought may be

relevant to potential civil tax liability or penalties. It is apodictic that Mr. Millman's intent is an important open issue in this action. Therefore, as Special Agent Calarco testified, the probative value of documents from sources other than Mr. Millman is minimal. It is essential in assessing Mr. Millman's intent that the Service know precisely what Mr. Millman relied on. In addition, the probative value of Mr. Millman's documents is greatly enhanced when one considers the probability of the existence of a taxpayer's notations on these documents. To insist that Mr. Millman's state of mind be ascertained solely from documents obtained from clients [11] and or engineers involved in these leases would virtually emasculate the Service's ability to investigate a taxpayer's intent. A taxpayer should not be able to direct the course or method of investigation that the IRS should take. To hold otherwise would defeat the investigatorial nature of an audit. *United States v. Davey*, 543 F.2d at 1000. Therefore, despite the fact that certain documents may be available from other sources, they cannot be considered as useful as Mr. Millman's originals for the purposes of assessing his intent. Inasmuch as the Service is entitled to documents from Mr. Millman in determining exactly what he relied upon in filing his tax return, the summons complies with the third prong of the *Powell* test.

## THE NEED FOR FURTHER DISCOVERY

An adequate record exists upon which the court may decide the issues. *Cf. United States v. Kis*, 658 F.2d 526, 542 (7th Cir.1981) Having found, after a full evidentiary hearing, that there is no evidence to support Mr. Millman's allegations of bad faith, the undersigned does not believe that further discovery is warranted. *See United States v. Will*, 527 F.Supp. 361, 366 (S.D.Ohio 1980), *aff'd*, 671 F.2d 963 (6th Cir.1982); *United States v. Turner*, 480 F.2d 272, 275–276 (7th Cir.1973) (citing

*United States v. Salter*, 432 F.2d 697, 700 (1st Cir.1970)); *United States v. Ladd*, 471 F.Supp. 1150, 1153–1154 n. 3 (N.D.Texas 1979); *United States v. McCarthy*, 514 F.2d 368, 376 (3d Cir.1975).

## CONCLUSION

For the reasons set forth above, it is respectfully recommended that the petitioner's request to enforce the summons be granted and the Respondent's request for discovery be denied.

---

11. Although the issue of an attorney-client privilege is an open one, the Government may have chosen not to entangle itself with this question

and thereby sought the documents from the taxpayer himself (Millman).